JULIA ANN VASS, respondent,

*v.*

FRANK M. WARNER et al., appellants.

[Decided October 21st, 1920.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

92 N. J. Eq.                Vass v. Warner.

"The question here is one of the validity of this alleged gift by Mrs. Vass to Frank M. Warner and his wife. The doubt as to the validity arises from the situation existing between the parties at the time the alleged gift was made. The allegation of the bill is, that by reason of the relationship which had existed between the complainant in this case and the defendants— and by that I do not mean merely the blood relationship, but the actual physical relationship and the situation in which she stood toward them—whether by reason of those circumstances the gift is one which can be upheld or whether it must be set aside as one made through fraud or a lack of understanding on the part of the complainant as to what she was doing at the time.

"The rule is well settled in this state. The doctrine is laid down in such cases as *Slack* v. *Rees* and *Bensel* v. *Anderson* and *Post* v. *Hagan*. And there have been some recent pronouncements. There was one within the last year or two—the *Clark Case*—in which, I think, Vice-Chancellor Backes wrote the opinion. The rule is, that where a relationship of confidence exists the burden of proof is cast upon the donee to show not only that there was no fraud exercised by him, but that the donor understood clearly what she was doing. It is practically the same thing as the doctrine of independent advice mentioned in the *Slack-Rees Case;* the result amounts to the same thing.

"Now, in this case, you have, in the first place, the complainant, a very aged woman eighty-three years old; and there is no question, in my mind, from the observation I made of her as she testified in court, and as she acted in court, that her mental condition is weak. She is not in full possession of her faculties. The testimony of Dr. Carhart, who is entirely disinterested and a competent physician, is that that weakness has continued from and since the illness she had in May of last year; and that that illness consisted of septicemia, which would cause a dulling of the mental faculties; that she was worse at that time than she is to-day. The fact that she denies these signatures to these checks does not by any means indicate, as defendants' counsel argues, a contradiction of what she said to her counsel, leading to the drafting of the bill of complaint, because it appears in the

testimony that the first investigation made was made by some of her friends. She did not believe, she said, at that time that the Warners had taken away her money, or money from the bank account. And an investigation was made, and evidently it was found out after the bill had been filed that these checks had been put through. She further denied on the stand that she ever had any intention of making any gifts *inter vivos* to either of the defendants.

"The question is whether the burden of proof has been met by the evidence submitted by the defendants. Outside of the defendants themselves, who are, of course, interested witnesses, there was the evidence of Mrs. Conkling, who testified as to the mental condition of the complainant. Mrs. Conkling I took to be a disinterested witness, but her testimony as to that relates to the 2d or 3d or 2d and 3d of May, 1919. The testimony of Dr. Carhart, at the time he was in attendance upon the defendant, and at the time she had this fever, which, he says, ran from one hundred and one to one hundred and four, was from the 10th or 12th to around the 16th; so, that the testimony of Mrs. Conkling by no means contradicts the testimony of Dr. Carhart. Mr. Bullis also testified as to a conversation he had with the complainant which might seem to indicate a comprehension on her part as to what she wanted to do with certain of her property, but that conversation, obviously, also antedated the time of this illness and the gift, because she spoke to him about her desire to have the Hills, or her brother and sister, get the Blairstown house.

"There is, therefore, nothing whatever to show the condition of this woman's mind at the time of the occurrence or to show what she had in mind, or that she did fully understand and clearly comprehend what she was doing, except the testimony of Frank Warner himself. On the other hand, there are several circumstances, several bits of testimony, which do not harmonize with an idea that the defendants have been entirely frank in their testimony. It is to be expected, I presume, that the interest which they have in the suit should result in something of that kind.

"The cashier of one of the banks testified that when Mr. Warner came first to him in regard to the transfer of the money —the $1,000—he said to him that Mrs. Vass had told him, Mr. Warner, that she wanted to get her money, and that was the reason he wanted to have this check made; and when Warner returned after the check had been signed, he then told him (the cashier) that Mrs. Vass wanted Mr. Warner or Mrs. Warner to have the money. Mrs. Warner testified that the instrument which was signed by herself as a witness and by Mrs. Vass, having to do with the burial, was drawn up by Mr. Bullis at Mr. Warner's request, he having been told to make that request by instigation of Mrs. Vass. Mr. Bullis said that Mr. Warner didn't ask him to draw that up, or any paper; that he drew it up of his own volition; that Mr. Warner came and said she wanted to have a burial like that of her daughter, and it was Bullis' idea to draw this paper up as it was. Mr. Warner testified that Mrs. Vass had applied to him about two months prior to the date of the alleged gift for him to transfer her moneys from the Blairstown bank to the Newton bank. He said he refused at that time because he was afraid. He was not frank in stating why he was afraid, but it finally developed, as nearly as I could understand from what he said, that he was afraid to mix up in her financial affairs; that some criticism might come afterwards, or the fear he had that she might change her mind. If he had that fear, I cannot understand why he should not have had greater fear of criticism of his transfer at her request of the funds out of her own name to his name or the name of his wife. It does appear that he did exercise speed in the consummation of this thing. He made two trips to Blairstown and two to Newton after the noon hour of that day. He said he did that because Mrs. Vass asked him to do so, because she wanted to get the matter concluded before her brother returned—that she was fearful of a fuss. It seems to me that that very thing ought to have put him on his guard—ought to have warned him that whatever Mrs. Vass wanted to do he could not afford to have himself put in the situation of being a party to a secret transfer of funds in those circumstances, especially to himself and his wife, or either, and that if she had wanted to do it it would

have been his duty to have established that fact by calling an outside, disinterested witness who could testify that she, at the time she made this request of him, did understand clearly what it was that she was doing. He did not do that. He testified that the only reply he made, and the only thing he said to her when she said she wanted to have a check made to him for $1,- 000 on the one account and for $3,000 on the other account, was that he didn't have any checks, and that she then told him to go to the bank and get the checks. I asked him whether he had made no other objection to it, and upon that reminder he did say then that he had said this to her, 'Well, if that is what you want to do, all right,' or something to that effect. Upon his own testimony he made no effort whatever to find out whether she comprehended she was making a gift to him or his wife, or both of them, which was to be irrevocable or whether it would enure to their benefit only after her death, and that she would not be putting her money out of her own possession and control before her death.

"It does appear from several portions of the testimony that she had had in mind making disposition of certain parts of her property to different persons on her death, but there is nothing whatever, in any of the testimony which has been adduced as to her conversations of what she was going to do with her property, which is inconsistent with the idea that she meant to make that disposition at the time of her death. Her statement that she intended to pay the Warners will by no means show an intention to deprive herself of fifty per cent. of her lifetime accumulations.

"Another thing which has considerable weight, in my mind, is the fact that, notwithstanding that this gift was a surprise— if their testimony were true—it must have been a grateful surprise to the Warners, and one of the first things they would have done would have been to show some gratitude and appreciation, but there is not one word of testimony that either one of them ever thanked her for it. And Mrs. Warner never took the trouble to go one-half mile to see her after receiving $4,000 from her and tell her that she appreciated the gift. She said she didn't go there on that day or the next day, and not until

the second day after, and even then she doesn't say she made any mention to Mrs. Vass of it.

"Upon the authority of the cases, therefore, I am bound to adjudge that the burden of proof has not been sustained by the defendants, and there must be a decree for the return of the money and the bank books and other papers. The decree, of course, will restrain any disposition of these funds by the defendants other than by return to the complainant.

"Mr. Shipman—Will the bill be dismissed against the man? The money stands in the wife's name.

"The Court—No, the bill will not be dismissed against him."

*Mr. Egbert Rosecrans,* for the respondent.

*Mr. George M. Shipman,* for the appellants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR—13.

*For reversal*—None.